## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:16-cv-20413

GARY COOPER, on behalf of himself and all
others similarly situated,

      Plaintiff,

          v.                                                    **CLASS ACTION**
                                            **JURY DEMAND**

PENNYMAC LOAN SERVICES, LLC; QBE
SPECIALTY INSURANCE COMPANY, QBE
FIRST INSURANCE AGENCY, INC., and
PRAETORIAN INSURANCE COMPANY,

      Defendants.
_____/

### CLASS ACTION COMPLAINT

Plaintiff Gary Cooper files this class action complaint, on behalf of himself and all others
similarly situated, against Defendants QBE Specialty Insurance Company ("QBE Specialty"),
Praetorian Insurance Company ("Praetorian"), QBE FIRST Insurance Agency ("QBE FIRST")
(collectively "QBE" or the "QBE Defendants"), and PennyMac Loan Services, LLC
("PennyMac").

### INTRODUCTION

1.     This is the nineteenth class action case brought by Undersigned Counsel in this
District seeking to redress injuries resulting directly from mortgage lenders' and servicers' force-
placed insurance practices.  Plaintiff and a proposed nationwide class of PennyMac borrowers seek
to recover damages they have suffered as a result of PennyMac and QBE's standard practice of
charging borrowers undisclosed and illegitimate costs in connection with force-placed insurance.
This Court has already certified litigation and settlement classes on these same claims in force-
placed insurance litigation against other mortgage lenders and servicers, and has approved

injunctions prohibiting the same practices complained of here in at least nine other class actions over the past four years.

2.      QBE and PennyMac have engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in their purchase and placement of force-placed insurance coverage throughout the country and in Florida, the nation's largest force-placed insurance market. This scheme was furthered by the fact that for a portion of the class period, Defendant QBE Specialty wrote surplus-lines force-placed insurance and was not required to submit its rates for force-placed insurance coverage to the Florida Office of Insurance Regulation ("FLOIR") for approval.

3.      The facts specific to Plaintiff Cooper are some of the more egregious facts among the nineteen force-placed class actions litigated by Undersigned Counsel.  PennyMac forced coverage on Mr. Cooper's property and charged him "premiums" for that coverage that were many times more than he had paid for voluntary insurance.  Although Mr. Cooper made payments to his mortgage after coverage was forced, PennyMac is still seeking $30,105 from Mr. Cooper allegedly in force-placed insurance charges allegedly due and owing.

4.      Plaintiffs bring these claims against: (1) PennyMac for its conduct towards all of its borrowers with force-placed insurance, and (2) the QBE Defendants for damages resulting from their force-placed insurance program not only with PennyMac, but also for their practices in cooperation with other mortgage lenders and servicers.

## PARTIES

5.      Plaintiff Gary Cooper was charged for force-placed insurance on his home in Miami, Florida by Defendant PennyMac. Pursuant to their exclusive arrangement, PennyMac forced coverage through the QBE Defendants in 2013 and 2014.  Mr. Cooper is a citizen of the State of Florida and resides at 20024 SW 82nd Place, Miami, Florida 33189.

6. PennyMac is a Delaware limited liability company that is wholly owned by Private National Mortgage Acceptance Company, LLC. PennyMac services residential mortgage loans in Florida and throughout the United States.

7. QBE Specialty Insurance Company is a North Dakota corporation with its headquarters at 88 Pine Street in New York, New York. QBE Specialty is a surplus-lines insurer and did not have its insurance rates approved by the FLOIR.

8. Praetorian Insurance Company is a Pennsylvania corporation with its headquarters at 88 Pine Street in New York, New York. In or about 2012, QBE merged its Florida force-placed insurance providers – QBE Specialty and Balboa Insurance Company – into Praetorian. Unlike QBE Specialty, Praetorian filed its force-placed insurance rates with the FLOIR in 2013. Upon information and belief, the force-placed scheme described below did not change when the force-placed insurance business was moved to Praetorian.

9. QBE FIRST Insurance Agency, Inc. is a California corporation with its headquarters at 9800 Muirlands Boulevard in Irvine, California. QBE FIRST acts as the program manager for QBE's force-placed insurance programs and also provides outsourced services to mortgage servicers. QBE FIRST conducts business throughout the United States, including Florida.

## NATURE OF THE CASE

10. Plaintiff files this class action complaint to redress Defendants' wrongful conduct in manipulating the force-placed insurance market through collusive agreements involving kickback arrangements and other forms of improper compensation. Plaintiff does *not* challenge PennyMac's contractual right to obtain force-placed insurance to protect its interest in Plaintiff's loan, but instead challenges the manner in which it has manipulated the force-placed insurance

process to enrich itself and the QBE Defendants at the expense of Plaintiff and the Class, and in violation of its mortgage agreements.

11.     All mortgage lenders' force-placed insurance schemes operate in a materially similar fashion because only two insurers dominate the American market for force-placed insurance: Assurant, Inc. and QBE.  When a homeowner's voluntary insurance coverage lapses, the mortgage lender places insurance on the property and charges the borrower inflated amounts. Borrowers are told they will be charged the lender's cost of coverage and contract to do so, but in fact pay more than the lender for force-placed insurance.  This is because after the lender pays the insurer a premium for the forced coverage, the insurer, QBE here, kicks back a percentage of the premium to the lender or one of its affiliates.  The kickback is essentially a rebate on the cost of the insurance coverage.  The benefit of the rebate is not, however, passed on to the borrower.

12.     The amounts charged to borrowers for forced coverage are also inflated to cover other costs that are properly borne by the loan servicer.  These kickbacks, which are described in greater detail below, *see* ¶¶ 42-53, *infra*, not only allow the insurer to secure an exclusive relationship with the mortgage lender or servicer and keep the market closed, but also provide the participants in the scheme with millions of dollars in ill-gotten gains—all at borrowers' expense.

13.     The amounts charged for forced coverage have little or nothing to do with the risk insured or the value of the property, and are purely a function of this kickback scheme. This is demonstrated in part by the fact that the rates charged by QBE Specialty were not set by an actuary, but instead calculated in many instances by adding 20% to the rates of another insurer.  This action seeks compensation for borrowers who have been victimized by this practice and an end to this illegal scheme.

14.     PennyMac purchases force-placed insurance from the QBE Defendants pursuant to

a longstanding agreement to cover its entire portfolio of mortgage loans.  Defendants' arrangement returns a significant financial benefit to PennyMac and its affiliates that is unrelated to any contractual or bona fide interest in protecting PennyMac's interest in the loan.  Pursuant to its agreement, PennyMac purchases insurance policies with inflated prices from the QBE Defendants, and in exchange, QBE pays PennyMac kickbacks in the form of unearned "commissions," ceded premiums for riskless reinsurance, subsidies for below-cost mortgage servicing functions (that often have nothing to do with providing insurance coverage), or qualified expense reimbursements, among other things.  PennyMac then imposes these inflated charges upon borrowers in amounts it claims to represent the cost of insurance, but in fact include the secret reimbursements, commissions, kickbacks, and other illicit consideration the QBE Defendants remit to PennyMac and/or its affiliates.

15.    Defendant PennyMac's desire to reap greater profits through its prearranged agreements with the QBE Defendants leads it to select the QBE Defendants' high-priced insurance and subsequently charge its borrowers.  The charges it imposes on borrowers, which PennyMac attributes to the cost of the insurance, are not only greater than its actual cost of providing the insurance and the actual cost paid by PennyMac, but also usually far greater than the premium for the borrowers' voluntary insurance, even though the force-placed insurance typically provides far less coverage.  Through this manipulation of the force-placed insurance selection process, Defendants maximize their own profits to the detriment of Plaintiff and the Class members.

## The Force-Placed Insurance Industry

16.    Lenders and mortgage servicers force-place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a mortgage loan.  Under the typical mortgage agreement, if the insurance policy lapses or

provides insufficient coverage, the lender has the right to force-place a new policy on the property to protect its interest in the loan and to charge the premium to the borrower.

17.     Force-placed insurance schemes like the one at issue here take advantage of the discretion afforded to the lenders and servicers in standard form mortgage agreements.  The mortgage agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

18.     These schemes also violate the mortgage contract's express terms.  The borrower contracts to compensate the lender for the actual cost that the lender or servicer pays the insurer for the forced coverage, but is then charged an inflated amount – more than the lender or servicer actually paid.

19.     Force-placed insurance providers, like the QBE Defendants here, enter into exclusive relationships with mortgage lenders and servicers to provide master force-placed insurance policies.  To maintain their exclusive relationships with these lenders and servicers, the force-placed insurers pay them unearned "kickbacks," often as a percentage of the force-placed premiums that mortgage lenders and servicers pay; offer them subsidized mortgage servicing functions; enter into lucrative captive reinsurance deals with them; and/or provide other financial benefits not attributable to the cost of insuring the property.

20.     During a 2012 hearing on force-placed insurance at the National Association of Insurance Commissioners ("NAIC"), Mr. Birny Birnbaum, an expert on the force-placed insurance market, illustrated the staggering growth in profits that force-placed insurance schemes have

reaped in recent years:[1]

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004–2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                13                August 9, 2012

21.     The QBE Defendants are one of just two insurance companies that control virtually the entire force-placed insurance market.  As shown below, QBE controlled 41.1% of the nationwide market share for force-placed insurance in 2011.  QBE and Assurant, Inc., the other major insurer with significant market share, controlled 99.1% of the force placed insurance market in the same year, and held no less than 96.1% of the market share between 2004 and 2011.  Large mortgage lenders and servicers sustain the two insurers' market dominance by agreeing to purchase all force-placed insurance from the insurers in exchange for the kickbacks described in this Complaint.

---

[1] This graph and the ones that follower are from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at: http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

**Assurant and QBE Are the Market for LPI:**
**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

22.     It is no surprise that these practices have come under increased scrutiny in recent

years by the government and regulators. For example:

> On April 18, 2013, the New York Department of Financial Services'
> ("NYDFS") investigation into force-placed insurance practices reached a
> settlement with QBE Holdings, QBE FIRST, and QBE Insurance
> Corporation that included a $10 million penalty paid to the State of New
> York and required it to lower its force-placed insurance rates going forward
> from that date.[2]  Further, under the Consent Order, the QBE Defendants are
> prohibited from paying commissions to any servicers, or entity affiliated
> with a servicer, on force-placed insurance policies obtained by the servicer.
> *See* QBE & NYDFS Consent Order, April 18, 2013.

> At NYDFS hearings on May 17, 2012, related to the force-placed insurance
> market, the Superintendent of Financial Services, Benjamin Lawsky, stated
> that the Department's initial inquiry uncovered "serious concerns and red
> flags" which included: 1) exponentially higher premiums, 2) extraordinarily
> low loss ratios, 3) lack of competition in the market, and 4) tight

---

[2] *See Cuomo Administration Settles with Country's "Second" Largest Force-Placed Insurer,
Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors
Millions     of     Dollars*, Dep't of Fin. Servs., April 18, 2013, *available at,*
http://www.dfs.ny.gov/about/press2013/pr1304181.html.

8

relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> In sum, when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

> After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[3]

23.     The NYDFS 2013 Consent Order also required the QBE Defendants to refrain from reinsuring force-placed policies with affiliates of servicers, paying contingent commissions based on underwriting profitability or loss ratios, and providing free or below cost outsourced services to servicers, lenders, or their affiliates.

24.     Florida, which was not subject to the NYDFS 2013 Consent Order with QBE, is the epicenter for these force-placed insurance schemes.  In his presentation to the NAIC, Mr. Birnbaum illustrated that Florida, where Plaintiff resides, has the largest force-placed insurance market in the country.

---

[3] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at* http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

**LPI Premium by State:  Florida Has Become Ground Zero**

|     | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|-----|------|------|------|------|------|------|------|------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8% | 8.7% | 7.0% | 5.6% | 5.6% | 6.1% |
| NY  | 3.6% | 3.6% | 4.5% | 4.4% | 4.3% | 4.7% | 5.4% | 5.6% |
| IL  | 3.0% | 3.3% | 3.9% | 3.7% | 3.9% | 4.4% | 4.1% | 4.6% |
| NJ  | 2.9% | 2.7% | 2.9% | 2.7% | 2.7% | 2.9% | 3.4% | 4.0% |
| MI  | 4.2% | 4.4% | 4.4% | 5.8% | 3.6% | 2.7% | 2.2% | 2.0% |
| OH  | 3.6% | 3.8% | 3.5% | 2.7% | 2.4% | 2.2% | 2.3% | 2.9% |
| GA  | 3.4% | 3.2% | 3.2% | 2.4% | 2.3% | 2.3% | 2.3% | 2.3% |
| PA  | 2.6% | 2.6% | 2.7% | 1.8% | 1.8% | 1.8% | 1.7% | 1.8% |

CEJ LPI Presentation to NAIC                                   15                                   August 9, 2012

25.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiff and the proposed classes he seeks to represent.  This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by PennyMac and the QBE Defendants.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

27.     Plaintiff Cooper is a citizen of Florida who owns property in Miami-Dade County on which insurance coverage was forced by Defendant PennyMac through its exclusive arrangement with QBE.

28.     PennyMac, QBE Specialty, Praetorian, and QBE FIRST are registered to do business in Florida.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

10

29.     This Court has subject-matter jurisdiction over this action because Plaintiff's claims arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), according to the statute's jurisdictional statement, 18 U.S.C. § 1964.  Further, pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction based on Plaintiff's claims for violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

30.     This Court has further jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

31.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and Defendants. 28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

32.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

33.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

34.     The standard form mortgage agreements for loans owned or serviced by PennyMac include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan.  In the event that the insurance lapses, the standard form mortgage agreements permit PennyMac to obtain force-placed coverage to protect the lender's interest in the loan and to charge the cost of the insurance to the borrower rather than declare the borrower in default.

35.     What is unknown to borrowers, and not disclosed in the standard form mortgage agreements, is that PennyMac has exclusive arrangements with the QBE Defendants to manipulate the force-placed insurance market and artificially inflate the charges for forced coverage imposed on Plaintiff and the Class members.  The charges are inflated to provide PennyMac with kickbacks disguised as "commissions," or "expense reimbursements," or to provide PennyMac with lucrative reinsurance arrangements that include unmerited charges, and to provide other financial benefits in the form of below-cost mortgage servicing functions that are not attributable to the cost of insuring the individual property.

### PennyMac's and QBE's Force-Placed Insurance Scheme

36.     The QBE Defendants have exclusive arrangements with PennyMac to monitor PennyMac's mortgage portfolios and provide force-placed insurance.  In addition to the subsidized mortgage services it receives from the QBE Defendants, as set forth in detail below, PennyMac is kicked back a percentage of the force-placed premium.

37.     The scheme works as follows:  PennyMac purchases a master insurance policy from the QBE Defendants that covers the entire PennyMac portfolio of mortgage loans.  In exchange,

the QBE Defendants are given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.  QBE FIRST monitors PennyMac's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, QBE FIRST sends a cycle of notices to the borrower in PennyMac's name, stating that it will purchase insurance for the property, for which the borrowers will be financially responsible, and force-place it on the property.  It further states that the insurance charges will be applied to the borrower's loan, plus interest.  QBE FIRST uses its affiliated force-placed insurance underwriters – QBE Specialty and Praetorian – exclusively to place the insurance.

38.     The letters or notices sent to borrowers are done pursuant to an automated system used by QBE FIRST that generates and sends the letters at predetermined times.  The letters indicate an address for borrowers to submit proof of insurance or correspondence to PennyMac; however, the address is actually for a QBE location because they are performing these services for PennyMac.  Each borrower is subject to Defendants' automated system and receives materially the same letters described above.

39.     No individualized underwriting ever takes place for the forced coverage.  Insurance is automatically placed on the property and the amounts are charged to the borrower.  As stated in his testimony before the NYDFS, "lack of underwriting should also result in much lower acquisition expenses for force-placed insurance insurers, since no sales force is required to place the insurance."  Thus, the lack of individual underwriting should decrease, not increase, the cost of force-placed insurance.

40.     Nor does QBE Specialty use actuarial methods to set the rates for this surplus-lines forced coverage; instead, QBE Specialty set the rates 20% higher than Citizens' rates for

"voluntary" homeowners insurance even though QBE Specialty's force-placed policies provided less coverage. *See Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 670 (S.D. Fla. 2012) ("QBE has conceded that its force-placed insurance rates were not set by an actuary, but were arrived at by simply adding 20% to the rates of another insurance company.").

41.     Once coverage is forced on the property, Defendants charge the borrower an amount they attribute to the QBE force-placed insurance premium, which is either deducted from the borrower's mortgage escrow account by Defendants or added to the balance of the borrower's loan.[4]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

42.     To fund the force-placed insurance scheme, PennyMac pays premiums to the QBE Defendants, who then kick back a set percentage of the premium to PennyMac as a "commission" or an "expense reimbursement."  The money paid back to PennyMac and/or its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, the QBE Defendants may disclose to the borrower that PennyMac may earn "commissions" as a result of the forced placement of new coverage, or that PennyMac incurred "costs" as a result of the force-placement of insurance.

43.     In reality, however, no work is ever done by PennyMac to procure insurance for that particular borrower because the coverage comes through the master policy already in place. PennyMac does not seek out insurance policies on borrower's behalf and has no involvement in the placing of the insurance or the collection of the charges from the borrower.  As a result, the

---

[4]  On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

amount paid is not a true "commission," no income is "earned," and PennyMac does not incur any "costs" in relation to the force-placement of insurance for any particular borrower.

44.     The NYDFS 2013 Consent Order acknowledges that these "commissions" are unearned, noting, in relevant part:

> Commissions to Insurance Producers Affiliated with Mortgage Servicers
>
> In some cases, QBE has paid commissions to insurance agencies and brokers that are affiliates of mortgage servicers. . . The evidence from the [NYDFS] Investigation indicates that affiliated agencies and brokers do little or no work for the commissions QBE has paid to them[.]
>
> Commissions paid to affiliates are a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-place insurance premium rates. Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform.

45.     Similarly, the NAIC has expressed concern with the "reverse competition" at play in the lender-placed insurance market whereby the insurers compete by offering mortgage lenders and servicers a share in the profits, rather than by offering lower prices.   On its website, the NAIC states:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obliged to pay the cost of the coverage.   Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lower price for coverage since the cost is born by the borrower.   Normally competitive forces tend to drive down costs for consumers.   However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

*See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm.

46.     PennyMac also enters into agreements for QBE FIRST or affiliates to monitor or track PennyMac's entire loan portfolio and perform additional mortgage servicing functions.

These functions, which include, but are not limited to activities such as "new loan boarding," "escrow administration," and "loss draft services," are not related to the provision of force-placed insurance and are performed at below cost as a way to keep the exclusive arrangement in place. Indeed, QBE does not perform these services for a lender without also being the exclusive provider of force-placed insurance.

47.     The QBE Defendants are able to provide these services at below cost because of the enormous profits they make from their premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property generally comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers, like Plaintiff here, who are charged for the force-placed insurance unfairly bear the entire cost to service and monitor the entire PennyMac loan portfolio.   These charges, passed on to Plaintiff and the proposed classes, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and PennyMac is already compensated for these activities.

48.     Thus, the small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring PennyMac's entire loan portfolio, effectively resulting in a kickback.

49.     In addition, upon information and belief, the QBE Defendants enter into essentially riskless "captive reinsurance arrangements" with PennyMac to "reinsure" the property insurance force-placed on borrowers.   An *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.

16

Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS[.]

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to QBE, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by QBE and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

50. PennyMac's reinsurance program, like those of other servicers, is simply a way to funnel profits from the force-placed scheme, in the form of ceded premiums, to PennyMac at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  PennyMac and/or its affiliates enter into reinsurance agreements with the QBE Defendants that provide that the insurer will return to PennyMac significant percentages of the premiums charged to borrowers by way of ceded reinsurance premiums to PennyMac subsidiaries – which in turn provide these premiums to PennyMac often in the form of "soft-dollar" or other credits.  The ceded premiums are nothing more than a kickback and a method for PennyMac to profit from the forced placement of new coverage.  Indeed, while PennyMac and/or its affiliates purportedly provided reinsurance, they did not assume any real risk.

51. PennyMac and the QBE Defendants may also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE")

in the standard form insurance agreement. Both of these clauses typically protect the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy. Force-placed policies, however, take effect on the date of termination, and therefore "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause. This means the borrower is charged for coverage for which the lender or servicer has no exposure.

52.     The amounts charged to borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage. When Defendants add the cost of the high-price premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

53.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize Defendants' profits at the expense of Plaintiff and the other Class members. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property, are charged amounts which reflect inflated and illegitimate noncompetitive "premiums" for force-placed insurance. These "premiums" are inflated to finance undisclosed kickbacks to Defendants or their affiliates (who, as described above, perform little, if any, work related to the forced placement of the individual policies), as well as the cost of captive reinsurance arrangements and administrative services.

54.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies and have no ability to seek out and purchase their own force-placed insurance policy. Force-placed policies are commercial insurance policies intended to be sold to lenders and servicers and their terms are determined by the lender/servicer, here, PennyMac, and the insurer, here, the QBE Defendants.

55.     Plaintiff does not challenge PennyMac's right to force-place insurance coverage in the first instance.  He challenges the discretion afforded mortgage lenders and servicers in purchasing force-placed insurance, as well as Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating amounts for force-placed insurance, which PennyMac purchases from QBE and then chooses to charge to the borrower.  Servicers, like PennyMac, are financially motivated to select the insurer, like QBE, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," direct payments, discounted mortgage servicing, or debt forgiveness.

56.     This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiff the excess amounts charged to them beyond the true cost of insurance coverage.  Plaintiff seeks to recover the improper charges passed on to him and other PennyMac borrowers nationwide through his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, tortious interference with a contract or advantageous business relationship, and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), TILA, and RICO.

57.     Further, QBE employs this scheme throughout Florida with other servicers using the same lender-placed insurance master policies.  Like PennyMac, these other  servicers enter into captive insurance arrangements with QBE on similar terms where QBE can force coverage on borrowers' properties throughout Florida and pay kickbacks to those servicers as described herein.

**Plaintiff Gary Cooper**

58.     Plaintiff Gary Cooper took a mortgage loan from Equity Financial Group, Inc. on January 24, 2007, secured by a mortgage on real property at 20024 SW 82nd Place, Miami, Florida 33189.  At all times relevant to the allegations herein, Mr. Cooper's mortgage loan was owned

and/or serviced by PennyMac.

59.    Mr. Cooper's mortgage agreement provides as follows:

5.  **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.

*   *   *   *

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*   *   *   *

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . .  then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]

*   *   *   *

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

60.    Pursuant to the automated procedures in place and purporting to come from PennyMac, on May 16, 2013, Defendants sent a letter informing Plaintiff Cooper that PennyMac had not been provided proof of acceptable homeowner's insurance.  PennyMac informed Plaintiff

that if proof were not provided, it would purchase insurance for his property.  The letter also stated that temporary insurance had already been obtained through QBE Specialty.  Finally, the letter stated that Mr. Cooper would be required to reimburse PennyMac for the premium associated with the coverage.

61.     On June 30, 2013, PennyMac sent Plaintiff Cooper a second notice stating that it had not received evidence of insurance and that the temporary policy remained in force.  The second notice further stated that if PennyMac was not provided with evidence of insurance within 20 days, it might purchase a one-year lender–placed policy.  This second letter provided a list of important facts about lender-placed insurance.  Neither letter disclosed any aspect of the secret and illegal compensation arrangement entered into by QBE and PennyMac, or informed Mr. Cooper that he would be charged illegitimate amounts beyond PennyMac's cost of coverage.

62.     On July 22, 2013, PennyMac sent Plaintiff Cooper a Certificate of Coverage Placement which stated that PennyMac had not received evidence of insurance.  The letter stated that PennyMac had purchased $394,900.00 in hazard coverage with an annual hazard premium of $16,964.91.  The letter stated that Mr. Cooper would be required to reimburse PennyMac for the premium associated with the coverage.  The letter also provided a recap of important facts about lender- placed insurance.  The letter did not disclose any aspect of the secret and illegal compensation arrangement entered into by QBE and PennyMac, or inform Mr. Cooper that he would be charged illegitimate amounts beyond PennyMac's cost of coverage.

63.     On March 3, 2014, PennyMac sent a letter to Mr. Cooper stating that the policy it had purchased was about to expire and that it intended to renew his forced coverage.  The estimated premium associated with the renewal hazard policy was $9,437.08.  The letter also provided a recap of important facts about lender-placed insurance.  The letter did not disclose any aspect of

the secret and illegal compensation arrangement entered into by QBE and PennyMac, or inform Mr. Cooper that he would be charged illegitimate amounts beyond PennyMac's cost of coverage.

64.     On April 17, 2014, a second renewal letter was sent confirming that PennyMac intended to renew the insurance it had purchased with an annual hazard premium of $9,437.08. The letter also provided a recap of important facts about lender placed insurance.  The letter did not disclose any aspect of the secret and illegal compensation arrangement entered into by QBE and PennyMac, or inform Mr. Cooper that he would be charged illegitimate amounts beyond PennyMac's cost of coverage.

65.     On June 2, 2014, PennyMac sent Plaintiff Cooper a Certificate of Coverage Placement which stated that PennyMac had not received evidence of insurance.  The letter provided that PennyMac had purchased $394,900.00 in coverage with an annual hazard premium of $9,437.08.  The letter stated that Mr. Cooper would be required to reimburse PennyMac for the premium associated with the coverage.  The letter also provided a recap of important facts about lender-placed insurance.  The letter did not disclose any aspect of the secret and illegal compensation arrangement entered into by QBE and PennyMac, or inform Mr. Cooper that he would be charged illegitimate amounts beyond PennyMac's cost of coverage.

66.     Although Mr. Cooper made payments on his mortgage loan after coverage was forced, PennyMac has obtained a judgment, through its affiliate PennyMac Holdings, LLC, against Mr. Cooper for all lender-placed insurance premiums in the amount of $30,105.67.

67.     Defendants' communications to Mr. Cooper were false and misleading. Defendants represented in each of their letters to Mr. Cooper that they were charging him the amounts they paid for the cost of the insurance.  However, the charges imposed on Mr. Cooper did not reflect Pennymac's true cost of coverage because PennyMac was receiving an effective rebate

22

on the force-placed insurance through the kickback scheme described above.  PennyMac had, as such, paid less for coverage than it represented to and charged Mr. Cooper and the Class members.

68.     Defendants' communications to Mr. Cooper were also misleading in that they represented that PennyMac needed to purchase insurance for Mr. Cooper's property when a master policy was already in place, and neither PennyMac nor any of its affiliates would, in fact, perform any additional work to procure coverage for Mr. Cooper's property.

69.     It was never disclosed to Mr. Cooper or the putative Class members that because of Defendants' kickback scheme, PennyMac would effectively be paying less for the force-placed insurance coverage than it would charge Mr. Cooper and the putative class.  Nor was it disclosed to Mr. Cooper or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

70.     There were no material differences between Defendants' actions and practices directed to Mr. Cooper and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.  Class Definition

71.     Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated.  Plaintiff seeks to represent the following three classes:

> **(1) Nationwide class:**
>
> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through PennyMac or its affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.
>
> **(2) Florida Subclass:**

All Florida borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through PennyMac or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

### (3) Florida All Mortgage Servicer Class against the QBE Defendants

All borrowers who, within the applicable statutes of limitation, were charged for force-placed hazard insurance coverage placed on property in Florida through any mortgage servicer and/or their affiliates, entities, or subsidiaries for a force-placed insurance policy written by the QBE Defendants. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees. Also excluded from this class are any such borrowers who have released their claims through a settlement.

72. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

73. Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B. Numerosity

74. The proposed classes are so numerous that joinder of all members would be impracticable. Defendants sell and service hundreds of thousands of mortgage loans and insurance policies in the State of Florida and nationwide. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Defendants. The precise number of Class members number at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

### C. **Commonality**

75.     There are questions of law and fact that are common to Plaintiff's and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

a.   Whether PennyMac breached its mortgage contracts with Plaintiff and the Class by selecting higher priced force-placed insurance policies in order to receive illegal kickbacks (in the form of unwarranted commissions, expense reimbursements, below-cost mortgage servicing, or reinsurance payments) and by charging the higher cost to Plaintiff and the Class members;

b.   Whether PennyMac breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated insurance premiums being charged to Plaintiff and the Class members;

c.   Whether Defendants manipulated the force-placed insurance procurement process in order to maximize their profits to the detriment of Plaintiff and the Class members;

d.   Whether PennyMac performed any work or services in exchange for the "commissions" and other forms of kickbacks it collected;

e.   Whether PennyMac incurred any expenses in the placement of force-placed insurance on Plaintiff's or the Class members' properties;

f.     Whether an objective consumer would be deceived by PennyMac's arrangement, which incentivizes Defendants to charge excessive fees for force-placed insurance, and therefore violates FDUTPA;

g.   Whether the QBE Defendants intentionally and unjustifiably interfered with Plaintiff's and the Classes' rights under the mortgage contracts by inducing PennyMac to impose inflated force-placed insurance premiums on Plaintiff and the Classes in exchange for kickbacks and other financial windfalls, including steeply discounted administrative services for the entire PennyMac loan portfolio;

h.   Whether there was actually a transfer of risk under Defendants' purported reinsurance arrangement;

i.   Whether QBE has been unjustly enriched at the expense of Plaintiff and the Class; and

j.   Whether Plaintiff and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.   Typicality**

76.    Plaintiff is a member of the Classes he seeks to represent.  Plaintiff's claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

**E.   Adequacy of Representation**

77.    Plaintiff is an adequate representative of the Classes he seeks to represent and will fairly and adequately protect the interests of the Classes.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him.  There is no hostility between Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a Class action.

78.    To prosecute this case, Plaintiff has chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.   Requirements of Fed. R. Civ. P. 23(b)(3)**

79.    The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.   All claims by Plaintiff and the unnamed Class members are based on the force-placed insurance policies that Defendants unlawfully implemented and their deceptive and egregious actions involved in implementing the force-placed policy.

26

80.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

81.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.  Superiority**

82.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside all across the state;

(b) Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.   As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.  Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

83.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

84.     Defendants have acted or failed to act in a manner generally applicable to the

Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## COUNT I

### BREACH OF CONTRACT
### (against PennyMac on behalf of the Nationwide class and the Florida Subclass)

85.     Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further alleges as follows.

86.     Plaintiff and all similarly situated Class members have mortgages that were owned and/or serviced by PennyMac.

87.     Plaintiff's and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by PennyMac.  The force-placed provisions from Plaintiff's mortgage is set forth above and true and correct copies of the mortgage agreements are attached to this complaint as **Exhibit A**.

88.     Paragraph 5 of Plaintiff's mortgage requires that he maintain insurance on his property and provides that if he should fail to do so, the lender or servicer might obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the "cost of the insurance coverage."  Paragraph 9 of Plaintiff's mortgage further provides that the lender may do and pay for whatever is reasonable or appropriate to protect its interest in the property and rights under the mortgage agreement, including protecting and/or assessing the value of the property and securing and/or repairing the property.

89.     PennyMac charges borrowers amounts for force-placed insurance that include unearned "commissions" or "expense reimbursements" and other kickbacks, as well as subsidies for below-cost mortgage servicing functions that have little or nothing to do with the placement of

force-placed insurance.  These costs are not costs of coverage, and are not applied to protecting PennyMac's rights or risk in the collateral for borrowers' mortgage loans.  They are simply bribes to keep Defendants' exclusive relationship in place.

90.   Through the kickbacks it receives, PennyMac pays less for force-placed coverage than it charges to Plaintiff and other Class members.

91.    PennyMac breached the mortgage agreements by, among other things, charging Plaintiff and absent class members the amounts beyond the actual cost of coverage and more than what was reasonable or appropriate to protect its interest in the property.

92.   PennyMac also breached Plaintiff's and Class members' mortgage agreements by charging Plaintiff and the Class for duplicative insurance for the time period in which PennyMac is covered by the Lenders Loss Payable Endorsement of the Standard Mortgage Clause, as such coverage does not protect PennyMac's rights in its collateral or cover its risk.

93.   Plaintiff and the Class members have suffered damages as a result of PennyMac's breach of contract.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, seeks compensatory damages resulting from PennyMac's breach of contract, as well as injunctive relief preventing it from further violating the terms of the mortgages.  Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against PennyMac on behalf of the Nationwide Class and the Florida Subclass)

94.   Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further alleges as follows.

95.   A covenant of good faith and fair dealing is implied in every contract and imposes

upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

96.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

97.     Plaintiff's and the Class members' mortgage contracts allow PennyMac to force-place insurance coverage on borrowers in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

98.     PennyMac was afforded substantial discretion in force-placing insurance coverage. It was permitted to unilaterally choose the company from which it purchased force-placed insurance and negotiate the price of the coverage it procured without restriction.  PennyMac had an obligation to exercise its discretion in good faith, and not capriciously or in bad faith.

99.     The purpose of the mortgage clause allowing a lender, like PennyMac, to force place insurance is to protect the lender's interest in the property that is collateral for the mortgage loan.  PennyMac breached the implied covenant of good faith and fair dealing by making additional profits at Plaintiff's expense by force-placing insurance on the property and receiving kickbacks on that insurance that bore no relation to protecting its interest in the property.

100.    PennyMac further breached the implied covenant of good faith and fair dealing by, among other things:

(a) Manipulating the force-placed insurance market by selecting insurers (here, the QBE Defendants and their affiliates) that would artificially inflate premiums to include kickbacks to PennyMac not necessary to cover PennyMac's risk;

(b) Exercising its discretion to choose master insurance policies in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting policies with artificially inflated premiums to maximize PennyMac's own profits;

30

(c) Assessing inflated and unnecessary charges against Plaintiff and the Classes which PennyMac attributes to the cost of the insurance policy premiums;

(d) Collecting a percentage of the amount that it then charged to Plaintiff and the Classes as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e) Charging Plaintiff and the Classes for "commissions" or expense reimbursements when the insurance is prearranged and no commission is earned or due;

(f) Charging Plaintiff and the Classes the cost of having the vendor perform its obligation of servicing its entire mortgage portfolio, which is not properly chargeable to Plaintiff or the Classes;

(g) Force-placing insurance coverage that is duplicative of existing coverage, or in excess of what is required by borrowers' mortgage agreements;

(h) Seeking out an force-placed insurance insurer, here QBE, that will provide it the best deal in terms of below-cost mortgage servicing functions with the knowledge that these functions will be subsidized by the amounts paid for force-placed insurance;

(i) Force-placing insurance coverage in excess of that required to cover the lender's interest in the property; and

(j) Charging Plaintiff and the Classes an inflated charge for the force-placed insurance due to the captive reinsurance arrangement.

101.   As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class members have suffered damages.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, seeks a judicial declaration that PennyMac's conduct described above and the amounts charged to borrowers are in contravention of its duties of good faith and fair dealing.  Plaintiff also seeks compensatory damages resulting from PennyMac's breaches of its duties.  Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### VIOLATION OF THE FLORIDA
### DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (against PennyMac on behalf of the Florida Subclass)

102.    Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further alleges as follows.

103.    FDUTPA, section 501.201, Florida Statutes, *et seq.*, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

104.    Plaintiff and the Florida Class are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

105.    PennyMac has engaged in, and continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

106.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated charges for force-placed insurance by the above-named Plaintiff and the Florida classes, which in turn were intended to generate unlawful or unfair compensation for PennyMac.

107.    Specifically, PennyMac had an exclusive relationship with its vendor and preferred insurance carrier, QBE, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff and the Florida Class, and then receive compensation through kickbacks based on a percentage of the insurance policy's premium, as well as kickbacks in various other forms including, below-cost mortgage servicing functions, direct payments, "expense reimbursements," and debt forgiveness.   This effectively resulted in

32

PennyMac paying less than the amount it charged to Plaintiff and the Class.

108.     PennyMac's conduct of charging borrowers inflated amounts for their force-placed insurance to Plaintiff and members of the Florida Classes violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

109.     PennyMac is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, PennyMac is not a bank or savings and loan association regulated by federal agencies.

110.     Plaintiff and the Florida Classes have sustained actual damages as a direct and proximate result of PennyMac's unfair, deceptive, and unconscionable practices.   Section 501.211(2), Florida Statutes, provides Plaintiff and the Florida Classes a private right of action against Defendant and entitles them to recover their actual damages, plus attorneys' fees and costs.

111.     Plaintiff and the Florida Classes have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff, on behalf of himself and the Florida Classes, demand judgment against PennyMac for damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT IV

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against the QBE Defendants on behalf of the Nationwide Class and the Florida Subclass)

112.    Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further alleges as follows.

113.    Plaintiff and the Class members have advantageous business and contractual relationships with PennyMac pursuant to the mortgage contracts.   Plaintiff and the Class members have legal rights under these mortgage contracts.   For example, Plaintiff and the Class members have a right not to be charged exorbitant amounts attributed to force-placed insurance premiums in bad faith.

114.    The QBE Defendants had knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiff and the Classes and PennyMac.  The QBE Defendants were not parties to the mortgage contracts, nor were they third-party beneficiaries of the mortgage contracts.  Further, the QBE Defendants did not have any beneficial or economic interest in the mortgage contracts.

115.    The QBE Defendants intentionally and unjustifiably interfered with Plaintiff's and the Classes' rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with PennyMac and their affiliates, whereby the QBE Defendants provided consideration (kickbacks, ceded reinsurance premiums, and subsidized mortgage servicing, among other things) to  PennyMac in exchange for the exclusive right to force-place inflated and unnecessary premiums, which are purposefully and knowingly charged to Plaintiff and the Class members.

116.    As a result of the QBE Defendants' interference with the Plaintiff's mortgage

agreement, Defendant PennyMac breached the express and implied terms of its mortgage contracts with Plaintiff and members of the Classes, by using funds that were designated to pay insurance, taxes and other items, in order to pay non-designated costs of Defendants, including kickbacks, reinsurance premiums, and subsidized mortgage servicing functions (i.e. new loan boarding, loss drafts) that have no relation to the placement of force-placed insurance.

117.    Plaintiff and the Classes have been damaged as a result of the QBE Defendants' interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges in connection with the force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiff, on behalf of himself and all Class members similarly situated, seek a judgment in his favor against the QBE Defendants for the actual damages suffered by him as a result of their tortious interference.  Plaintiff also seeks all costs of litigating this action, including attorneys' fees.

## COUNT V

## UNJUST ENRICHMENT
### (against the QBE Defendants on behalf of the Florida All Mortgage Servicer Class )

118.    Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further alleges as follows.

119.    Plaintiff and the Class directly conferred benefits on QBE.  Specifically, QBE received benefits in the form of funds for force-placed insurance policies from Plaintiff and the Class members.

120.    QBE received below-cost payments from PennyMac and other banks and mortgage servicers for providing mortgage-servicing functions (that often had nothing to do with the

placement of the force-placed insurance), but included the entire cost of those functions in the amounts charged for force-placed insurance that PennyMac, other banks, and other mortgage servicers purchased and ultimately passed on to the borrowers.  QBE knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to them, but did not reduce the charges by the amounts paid to them from PennyMac, other banks, and other mortgage servicers for the tracking services.

121.    QBE paid significant monies to PennyMac, other banks, and other mortgage servicers in kickbacks, commissions, expense reimbursements or ceded reinsurance premiums tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to PennyMac in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

122.    On information and belief, QBE deducted the excess charges directly from borrowers' escrow accounts.  In the alternative, PennyMac, other banks, and other mortgage servicers in contract with QBE, were mere conduits for the delivery of insurance charges to QBE.

123.    As a result, Plaintiff and the Class have conferred a direct benefit on QBE.

124.    Plaintiff and the Class expected remuneration or would have expected remuneration had they known the true facts surrounding QBE's conduct.  For example, had Plaintiff and the Class known that the amounts PennyMac charged them for insurance also included the costs of the kickbacks and other improper charges, they would have protested or paid less.

125.    QBE had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

126.    QBE will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which QBE was unjustly enriched at

his or her expense.

 **WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, demands an award against QBE in the amounts by which QBE has been unjustly enriched at Plaintiff's and the Class members' expense, and such other relief as this Court deems just and proper.

**COUNT VI**

**UNJUST ENRICHMENT**
**(against PennyMac on behalf of the Nationwide Class and the Florida Subclass)[5]**

 127. Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further alleges as follows.

 128. PennyMac received benefits from Plaintiff and Class members in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and subsidized loan servicing costs.

 129. PennyMac entered into an agreement whereby the insurance vendor – here, QBE and its affiliates – would provide below cost mortgage servicing activities and cover PennyMac's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed.  PennyMac would then charge Plaintiff and the Class amounts for the force-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself.  The force-placed policies imposed on borrowers therefore cost less than what PennyMac had actually paid for them.

 130. QBE paid and collected significant monies in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium

---

[5] Plaintiff pleads his unjust enrichment claim against PennyMac in the alternative to his contractual claims against it.

(as a percentage).  Commissions or kickbacks were paid directly to PennyMac or its affiliates in order to be able to exclusively provide force-placed insurance policies.  QBE and its affiliates were mere conduits for the delivery of the kickbacks and improper charges to PennyMac or its affiliates.

131.    These payments directly benefitted PennyMac and/or its affiliates and were taken to the detriment of the borrower.  The kickbacks (in the form reimbursements, commissions, or reinsurance arrangements, as well as subsidized costs) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them.  Therefore, PennyMac had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

132.    Further, PennyMac was unjustly enriched through financial benefits in the form of increased interest income when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans and through duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause.

133.    As a result, Plaintiff and the Class members have conferred a benefit on PennyMac.

134.    PennyMac had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

135.    PennyMac will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which PennyMac was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, demands an award against PennyMac in the amounts by which it has been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT VII

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
## (against PennyMac on behalf of the Nationwide Class)

136.    Plaintiff re-alleges and incorporates paragraphs 1 – 70, above as if fully set forth herein and further alleges as follows.

137.    Plaintiff's and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

138.    PennyMac is a "creditor" as defined by TILA because it owned Plaintiffs' mortgages and changed the terms of the mortgage so as to create a new mortgage obligation, of which PennyMac was the creditor.

139.    Pursuant to TILA, PennyMac was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

140.    PennyMac violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving PennyMac and/or its affiliates as a result of the purchase of force-placed insurance.

141.    When PennyMac changed the terms of Plaintiff's mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation.  Under TILA,

PennyMac was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof.   On information and belief, PennyMac increased the principal amount under Plaintiff's mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.  Indeed, PennyMac, through its affiliate PennyMac Holdings, LLC, obtained a judgment for the lender placed insurance premiums in the amount of $30,105.67.

142.    PennyMac adversely changed the terms of Plaintiff's loan after origination in order to allow a kickback on the force-placed insurance charges.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  PennyMac never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to them or their affiliate.

143.    PennyMac also violated TILA by adversely changing the terms of Plaintiff's loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

144.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because PennyMac's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

145.    Plaintiff and Class members have been injured and have suffered a monetary loss arising from PennyMac's violations of TILA.

146.    As a result of PennyMac's TILA violations, Plaintiff and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

147.    Plaintiff and Class members are also entitled to recovery of attorneys' fees and costs to be paid by PennyMac, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiff, on behalf of himself and all Class members similarly situated, seeks a judgment in his favor against PennyMac awarding actual damages and a penalty of $500,000.00 or 1% of PennyMac's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by PennyMac, as provided by 15 U.S.C. § 1640(a)(3).

### COUNT VIII
### Violation of RICO, 18 U.S.C. § 1962(c)
### (against All Defendants on behalf of the Nationwide Class)

148.    Plaintiff re-alleges and incorporates paragraphs 1-70 above as if fully set forth herein and further allege as follows.

149.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

150.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included PennyMac, QBE, and QBE's affiliates.

151.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class members to pay inflated amounts for force-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses associated with monitoring PennyMac's entire loan portfolio, and concealing from Plaintiffs and Class members the true nature of those charges. Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

152.    The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

153.    PennyMac, and QBE conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

154.    PennyMac and QBE directed and controlled the enterprise as follows:

a.  QBE specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which PennyMac agreed;

b.  QBE drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from PennyMac.  The letters  fraudulently misrepresented the true "cost" of the insurance forced on their properties, and these letters were approved by PennyMac;

c.  QBE ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking PennyMac's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that a PennyMac affiliate would be paid a commission as compensation for work performed;

d.  QBE paid kickbacks to PennyMac and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

e.  by directing, controlling, and creating an enterprise and arrangement by which PennyMac would receive unearned kickbacks;

f.  by directing, controlling, and creating an enterprise and arrangement by which PennyMac would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, reinsurance, expense reimbursements, or credits that were merely bribes to keep the exclusive relationship and not disclosing same to borrowers;

g.  by directing, controlling, and creating an enterprise and program by which

42

PennyMac never charged the borrowers its actual or effective cost to procure the lender placed policies;

h. by directing, controlling, and creating an enterprise and program where QBE took money directly from borrowers' escrow accounts and took amounts which are not the actual or effective "cost" for lender placed insurance but instead, included illegal bribes and kickbacks;

i. by designing and directing an exclusive arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance. The charges were inflated to provide PennyMac and its affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted services, and/or to provide PennyMac with lucrative debt forgiveness or reinsurance payments. QBE benefited by securing business from PennyMac—they provide kickbacks to PennyMac at the expense of the borrowers who are charged the inflated charges;

j. by developing and implementing guidelines and criteria to determine when force-placed insurance is placed an a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made and/or resulted in "double coverage;" and

k. by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

155.     In order to further their control and direction of the enterprise, QBE paid bribes and kickbacks to PennyMac in the form of unearned commissions, direct payments, expense reimbursements, reinsurance payments, and below cost services.

156.     As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff and Class members with the intent to defraud and deceive Plaintiff and Class members.

157.     For example, QBE, with the approval of PennyMac, sent form letters to Plaintiff on PennyMac letterhead through the U.S. Mail, stating that PennyMac would purchase force-placed

coverage if voluntary insurance was not secured by a certain date.  Specifically, to Plaintiff Cooper, these Defendants represented in the letters that PennyMac would "buy" the required coverage that would cost $16,964.91, $9,437.06, or $5,908.20 annually depending on the policy.  In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiff were charged represented the actual cost of the policies, when in fact such amounts also included kickbacks and other costs paid as bribes to PennyMac.  Defendants engaged in similar conduct as to all class members.

158.    Defendants also knowingly and intentionally fostered the mistaken impression that PennyMac was actively "obtaining" a policy for the borrower when in fact no work was done and no expenses were incurred by PennyMac or its affiliates because a master policy was already in place and the force-placed insurance was issued pursuant to QBE's automated procedures.

159.    Indeed, none of the letters sent to Plaintiff disclosed the financial arrangement between the Defendants.

160.    Defendants had a duty to correct these misstatements and mistaken impressions. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiff unreasonably high amounts for force-placed insurance and were designed to lull Plaintiff and the class into believing that the charges were legitimate.

161.    Plaintiff and other homeowners would not have paid, or would have contested these specific charges had Defendants disclosed that the illegal bribes and kickbacks were included and that these forced-charges did not represent simply the cost of the required insurance coverage. Letters such as these were sent to Plaintiff as described above.

162.    QBE, with the approval of PennyMac and on PennyMac letterhead, also sent Plaintiff and the Class members force-placed insurance notices informing them that force-placed

insurance had been purchased.  The letters represented that monthly mortgage payments will be increased to include the costs of the policies or that the escrow account will be charged for the premiums that are paid. Thus, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance premiums that Plaintiff and class members were charged represented the true cost of the force-placed coverage.  In fact, the amounts charged to Plaintiff were less than what PennyMac actually paid for the insurance coverage because they included kickbacks, reinsurance profits, direct payments, "expense reimbursements," below-cost administrative services and other compensation returned to PennyMac but not passed on to Plaintiff or the borrowers.  Letters including this misrepresentation were sent to Plaintiff Cooper as described above.

163.    The omission was material, as it gave Defendants a colorable reason to charge Plaintiff unreasonably inflated amounts for insurance and would have influenced Plaintiff's decisions whether to pay the charges or contest them.  Plaintiff would not have paid or would have contested the charges for force-placed insurance had he known that the amounts charged to him included the kickbacks.  Letters including this misrepresentation were sent to Plaintiff Cooper as described above.

164.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiff and Class members that they could charge Plaintiff and Class members unreasonably high amounts for force-placed insurance.  This scheme to defraud proximately injured Plaintiff and the Class because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property.

Had they known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiff and Class members, in violation of the wire fraud statutes.

165.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiff and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiff and Class members seek compensatory damages, treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

<u>COUNT IX</u>

<u>Violation of RICO, 18 U.S.C. § 1962(d)</u>
<u>(against all Defendants on behalf of the Nationwide Class)</u>

166.    Plaintiff re-alleges and incorporates paragraphs 1-70 and 149-165 herein as if fully set forth in Count VIII.

167.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

168.    PennyMac and QBE illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

- agreeing that QBE would be PennyMac's exclusive force-placed insurance provider and would extract unreasonably inflated amounts from PennyMac's customers. Defendants also agreed that QBE would pay kickbacks to PennyMac and its affiliates;

- agreeing that QBE would monitor PennyMac's mortgage portfolios for lapses in voluntary insurance and would, with the approval of PennyMac, send misleading

notices to borrowers.  These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be force-placed, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to a PennyMac affiliate;

- entering into illusory commission, reinsurance or outsourcing agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

- agreeing to commit two or more predicate acts as described above in Count X.

169.   Through "soft-dollar" or other credits, PennyMac affiliates pass profits from this scheme to PennyMac.

170.   Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

171.   As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiff and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Defendants as follows:

(1)   Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and their counsel to be representatives of the Classes sought in this complaint;

(2)   Enjoining Defendants from continuing the acts and practices described above;

(3)   Awarding damages sustained by Plaintiff and the Class members as a result of

PennyMac's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Awarding Plaintiff and Class members compensatory damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(5)     Awarding damages sustained by Plaintiff and the Class members as a result of the QBE Defendants' tortious interference with the mortgage agreement;

(6)     Finding that QBE has been unjustly enriched and requiring it to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

(7)     Awarding Plaintiff and Class members costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Classes' counsel and experts, and reimbursement of expenses; and

(8)     Awarding actual damages and a penalty of $500,000 or 1% of PennyMac's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3);

(9)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(10)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Classes request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 4th day of February, 2016.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiff* | Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>Matthew Weinshall<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff* |
| Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiff* | |